(33 App. Div. 485.)

ALLEN et al. v. STEVENS et al.

(Supreme Court, Appellate Division, Fourth Department. October 7, 1898.)

1. WILLS—CONSTRUCTION—CHARITABLE BEQUEST—DURATION.
    One clause of a will gave the residue of testator's property to trustees to found a home for the aged, and authorized his executors to rent or sell any part of the real estate he owned at his death, and provided that, after they had executed their trust, they should convey to the trustees the residue of his property for the maintenance of the home referred to, and authorized the trustees to rent or sell any part of it, and an additional clause empowered his executors or the trustees to retain his interest in a certain bank, and continue the business at their discretion, but provided that it was not to be continued, nor any portion of his property held, longer than the lives of two persons named. *Held,* that testator intended to establish a permanent home for the aged, and not one for the lives only of the persons named in the additional clause.

2. CHARITIES—BENEFICIARIES—UNCERTAINTY—PERPETUITIES—POWER OF DISPOSITION.
    Laws 1893, c. 701, providing that gifts, grants, bequests, and devises "which shall be in other respects valid under the laws of the state," shall not be invalid if the beneficiaries are indefinite and uncertain, is expressly limited to the abrogation of the rule respecting indefiniteness, and does not change the rule of statutory limitation of the power to suspend alienation, or of the power of a testator leaving a wife, husband, child, or parent to give more than one-half of his estate to charitable corporations.

3. SAME.
    Laws 1860, c. 360, limiting the power of a testator leaving a wife, husband, child, or parent to give more than one-half of his estate to charitable corporations, applies not only to corporations existing at his death, but to those created afterwards.
    Ward, J., dissenting.

Appeal from special term, Onondaga county.

Action by Benjamin G. Allen and others, heirs and next of kin of Nathan F. Graves, deceased, against Sidney A. Stevens and others, to obtain a construction of his will. A judgment was entered on a decision of the special term (49 N. Y. Supp. 431) separately stating the facts found and the conclusions of law, and an appeal was taken by the heirs and next of kin, by the administrator of Catherine H. Graves, the widow of Nathan F. Graves, deceased, and by all her heirs and next of kin, from the whole of the judgment; by the executors and trustees of Nathan F. Graves, deceased, from that part of the judgment awarding additional allowances to attorneys other than to their own; and by the attorney general from that part of the judgment awarding additional allowances to attorneys other than his own. Reversed.

Argued before HARDIN, P. J., and FOLLETT, ADAMS, GREEN, and WARD, JJ.

William G. Tracy, for plaintiffs.

C. Carskadden, for administrator, heirs, and next of kin of Catherine H. Graves, appellants.

George B. Cook, for executors and trustees of Nathan F. Graves, appellants and respondents.

Frank Hiscock, for the attorney general, appellant and respondent.

George D. Chapman, for certain respondents.

M. E. Driscoll, for St. Joseph's Hospital, respondent.

Joseph W. Sutphen, for the General Synod, respondent.

Augustus C. Stevens, for executors, defendants and respondents.

FOLLETT, J.    This action was begun in December, 1896, by the heirs and next of kin of Nathan F. Graves, deceased, to obtain a construction of his will.    The testator died at Syracuse, N. Y., July 21, 1896, leaving a last will and testament, drawn by himself, and executed September 15, 1893, which was duly admitted to probate by the surrogate's court of the county of Onondaga, September 5, 1896. The testator left a widow, Catherine H. Graves, two brothers, and two nephews, the plaintiffs herein, his sole heirs and next of kin.    August 15, 1896, Catherine H. Graves was duly adjudged to be a person incompetent to manage herself or her affairs, and Sidney B. Breese was appointed the committee of her person and estate, who answered in this action, admitting the allegation in the complaint, that part of the will was invalid.    July 12, 1897, Catherine H. Graves died, and Sidney B. Breese, who had been her committee, was duly appointed the administrator of her estate with the will annexed, who, and all the heirs and next of kin of Catherine H. Graves, were subsequently made parties defendant herein, and answered.    The testator left a will, which contains two clauses which are the subject of this litigation:

"Tenth. I give, bequeath, and devise all the rest and residue of my property of every kind, personal and real, wherever situate, to my trustees hereinafter named, for the purpose of founding, erecting, and maintaining Graves Home for the Aged, to be located in the city of Syracuse, in the state of New York.    It is intended as a home for those who, by misfortune, have become incapable of providing for themselves, and those who have slender means of support.    The institution to be known as the 'Graves Home for the Aged.'    I hereby appoint Charles E. Stevens, Rasselas A. Bonta, and Maurice A. Graves for the trustees to execute the above trust.    I hereby authorize and empower my executors, or the survivor of them, to rent or

sell any part or all of my real estate that I may own at the time of my death. They are authorized to employ a person or persohs to have charge of the real estate, to collect rents, & to make repairs, and to pay such sums for compensation as they may deem reasonable and proper. After my executors have executed their trust, and paid all the legatees provided for in this will, they are authorized and directed to convey to the said trustees above named the balance and remainder of my property of every kind, to be applied for the purposes above provided; and the said trustees or the survivor are authorized to rent or sell all or any part of my real or personal property, and to employ such agents as they may deem proper to take charge of the same, and pay them such compensation as they deem best.

"Eleventh. My executors or my trustees are authorized to retain my stock and shares in the New York State Banking Company, and continue the business of banking for a term of years, at their discretion, but may sell the same, or any part thereof, at any time; but the same is not to be continued, nor any portion of my property held, longer than the lives of Catherine Graves Roby, daughter of Sidney B. Roby, of Rochester, and Helen Breese Graves, daughter of Maurice A. Graves, of Syracuse."

It is apparent on the face of the will that by the tenth clause the testator intended to establish a permanent home for the aged, and not one which should endure only during the lives of Catherine Graves Roby and Helen Breese Graves, the persons mentioned in the eleventh clause. If the limitation prescribed by the eleventh clause was intended to relate to property other than to the shares in the New York State Banking Company, the testator's purpose was that his executors should not hold any part of his estate in their executorial capacity beyond the duration of these lives, and at the termination of that period the estate should be converted, all the legacies paid, and the residue turned over to the trustees for the Graves Home for the Aged, to be administered thereafter perpetually for the benefit of that charity. Such being the just and natural construction of the testator's scheme, the result is that the power of alienation of the property attempted to be disposed of by the tenth clause is suspended for more than two lives in being.

Again, by the first clause of the will the dividends on the shares in the New York State Banking Company and the rents of the realty south of James street, in the city of Syracuse, were to be paid to the widow during her life; and, in case the limitation in the eleventh clause relates to all the testator's property, the power of alienation as to bank shares and realty south of James street might, under the terms of the will, be suspended during three lives in being at the death of the testator, which would render the disposition of that part of the estate invalid. Hawley v. James, 16 Wend. 59, 121; Tayloe v. Gould, 10 Barb. 388, 398; 4 Kent, Comm. 283. In case the testator had died before May 13, 1893, when chapter 701 of the Laws of 1893 took effect, leaving a will disposing of his residuary estate, as provided by the tenth clause, such disposition would have been invalid for the additional reason that the beneficiaries attempted to be provided for are so indefinite as to be unascertainable. Bascom v. Albertson, 34 N. Y. 584; Tilden v. Green, 130 N. Y. 29, 28 N. E. 880. Chapter 701 of the Laws of 1893 was passed for the purpose of abrogating the rule then existing that devises and bequests otherwise valid were invalid in case the beneficiaries were indefinite and uncertain. The statute arose out of the discussion following the de-

cision of Tilden v. Green, supra, which case followed a long line of cases in this state. This statute does not change the rule existing in this state in respect to the limitation upon the power to suspend the alienation of property, or the limitation of the power of testators leaving a wife, husband, child, or parent to give more than one-half of their estate to benevolent, charitable, scientific, religious, or missionary associations or corporations. The statute expressly relates to gifts, grants, bequests, or devises "which shall in other respects be valid under the laws of this state." This language, it seems to me, expressly limits the scope of the statute to the abrogation of the rule in respect to indefiniteness. The scope of this statute has not been judicially determined in this state, but three learned text writers have construed it in harmony with the views above expressed. Chaplin, Exp. Trusts, § 514; Fowler, Charit. Uses, 106, 111; Thomas, Estates, 847, 852. By the tenth clause of the will the residuum of the estate, which constitutes the greater part of the entire estate, is to be held perpetually by the trustees named and those who shall succeed them in trust for the benefit of beneficiaries so indefinite as to be unascertainable. The eleventh clause of the will does not limit the duration of the Graves Home for the Aged during the lives of Catherine Graves Roby and of Helen Breese Graves, the clear intention of the testator being that the Graves Home should exist for an indefinite period, unlimited by time.

It is urged by the learned counsel for the respondent that the testator intended that there should be incorporated under the name of the 'Graves Home for the Aged' a corporation which should take the residuary estate for the purpose of carrying out the provisions of the tenth clause. No such intention was expressed in the will; but in case such an intention can be, by any stretch of construction, inferred, the case of the respondents is not greatly aided, for it is conceded that by the tenth and preceding clauses of the will more than one-half of the testator's estate is bequeathed and devised for benevolent and charitable purposes. It is urged, however, that chapter 360 of the Laws of 1860 places no limitation upon the power of testators to devise and bequeath more than half of their estates to charitable purposes unless given to charitable corporations. It is true that the statute limits the power of testators in such cases to give more than half of their estates to associations or corporations, but a construction of the statute that the limitation applied only to the power of testators to give more than half of their estates to corporations existing at the death of the testators, but that it imposes no limitation upon their power to give to corporations to be created after their death, would be a nullification of the statute; and so I conclude that if a testator leaving a husband, wife, child, or parent gives more than half of his entire estate to a benevolent corporation to be created after his death, the gift of more than one-half is invalid. In this case the testator's widow, through her committee, asserted in her answer that the disposition of more than one-half of his estate for charitable purposes was invalid, and demanded that one-half thereof be paid over to her.

Many other questions are discussed in the briefs of the counsel for the parties, but for the reasons stated I think the judgment should be

reversed, and a new trial granted, with costs to the appellants who have appealed from the whole of the judgment to abide the event.

All concur, except WARD, J., dissenting.

---

Appeal by the plaintiffs and by the defendants Sidney B. Breese, as administrator with the will annexed of Catherine H. Graves, deceased, and by Sidney A. Stevens and others, the heirs at law and next of kin of Catherine H. Graves, from a judgment of the supreme court entered in the clerk's office of Onondaga county on the 30th day of December, 1897, adjudging that certain bequests contained in the will of Nathan F. Graves for the founding and maintaining of Graves Home for the Aged, to be located in the city of Syracuse, in the state of New York, and other provisions of the said will, are valid; and also appeal from the costs and extra allowance of costs to the attorney general of the state and to the executors and trustees of Nathan F. Graves, deceased, and their attorneys; also, appeal of the said defendants Charles F. Stevens and others, as executors and trustees, from the allowance of costs to the attorney for the plaintiff of $2,000. and to the attorney general of an extra allowance of $1,800, embraced in the said judgment; also appeal of the said executors and trustees from so much of the said judgment as provides extra allowances of costs to other parties and attorneys in the action; also appeal by the attorney general from the extra allowances of costs to all the parties and attorneys in the action except himself. The action was brought by the plaintiff for the construction of the will of Nathan F. Graves, deceased, and judgment was rendered by the special term of Onondaga county, construing said will, and adjudging that the trust provisions contained therein were valid. The plaintiffs are the heirs at law and next of kin of the said Nathan F. Graves. The deceased left a widow, Catherine H. Graves, who, before the commencement of the action, was adjudged of unsound mind, and a committee was appointed over her property and person. She and her committee were made parties defendant. After the trial, and before the decision in the action, the said widow died, and Sidney B. Breese was duly appointed administrator of her estate, and he, as such administrator, and the heirs and next of kin of the widow, were substituted as defendants in the action in the place of the widow and her committee. There is no appeal from that portion of the judgment holding that the bequests contained in the first, second, third, fourth, fifth, sixth, seventh, eighth, and ninth clauses of the will are valid (except so far as limited and affected by chapter 360 of the Laws of 1860). The will was admitted to probate in the surrogate's court of Onondaga county on the 5th day of September, 1896, as a will valid to pass real and personal property, and duly recorded. The trustees under the will were also the executors named therein, but Rasselas A. Bonta duly renounced as executor, but did not renounce as trustee under the said will. A number of corporations and associations, charitable and religious, were made legatees under the will, and were parties to the action, and appeared and answered. The first clause of the will made provisions for the testator's wife, Catherine. Then followed eight clauses providing legacies for the corporations and charitable and religious institutions. The ninth clause gave legacies to relatives and friends of the deceased, and the tenth and eleventh clauses, being the remaining clauses of the will, are those upon which the controversy in this action arises, and will appear in the opinion. The testator died July 21, 1896, a resident of Syracuse, in this state. Other facts, and the questions raised upon the appeal, will appear in the opinion.

WARD, J. (dissenting). The testator, at the time of his death, in July, 1896, had reached the advanced age of 83 years. He never had any children, but left a widow, still older than himself, and two brothers, and two sons of deceased sisters, his heirs at law and next of kin, who are plaintiffs in this action. He left personal property of

about the value of $65,000, after deducting claims and demands made by suit brought, and about $100,000 in value of real estate, subject to similar deductions. He left a last will and testament, which had been executed in September, 1893. His business had been that of a lawyer and a banker in Syracuse, transacting his law business mainly in his banking office. He drew the will himself, and seems to have been a very charitably disposed person, devoting eight of the eleven provisions in his will to bequeathing legacies aggregating a large amount to various charitable and religious institutions, giving specific directions in several instances as to the distribution of the funds, and stating specific objects to which he wished those funds devoted. The tenth and eleventh clauses of his will are as follows:

"Tenth. I give, bequeath, and devise all the rest and residue of my property of every kind, personal and real, wherever situate, to my trustees hereinafter named, for the purpose of founding, erecting, and maintaining Graves Home for the Aged, to be located in the city of Syracuse, in the state of New York. It is intended as a home for those who, by misfortune, have become incapable of providing for themselves, and those who have slender means of support. The institution to be known as the 'Graves Home for the Aged.' I hereby appoint Charles E. Stevens, Rasselas A. Bonta, and Maurice A. Graves for the trustees to execute the above trust. I hereby authorize and empower my executors, or the survivor of them, to rent or sell any part or all my real estate that I may own at the time of my death. They are authorized to employ a person or persons to have charge of the real estate, to collect rents, & to make repairs, and to pay such sums for compensation as they may deem reasonable and proper. After my executors have executed their trust, and paid all the legatees provided for in this will, they are authorized and directed to convey to the said trustees above named the balance and remainder of my property of every kind, to be applied for the purposes above provided, and the said trustees or the survivor are authorized to rent or sell all or any part of my real or personal property, and to employ such agents as they may deem proper to take charge of the same, and pay them such compensation as they deem best.

"Eleventh. My executors or my trustees are authorized to retain my stock and shares in the New York State Banking Company, and continue the business of banking for a term of years, at their discretion, but may sell the same, or any part thereof, at any time; but the same is not to be continued, nor any portion of my property held, longer than the lives of Catherine Graves Roby, daughter of Sidney B. Roby, of Rochester, and Helen Breese Graves, daughter of Maurice A. Graves, of Syracuse."

The learned trial court found as a conclusion of law that the bequest in the tenth clause of the will was "a legal and valid disposition of the residue of the testator's estate, and constitutes and creates a valid and legal trust of such property under the laws of the state of New York, and is not repugnant to any existing statute; * * * that the trustees therein named are charged with the duty of making effective the object the testator had in view, the supreme court to have control over such bequest; * * * that by the terms of the said testator's will that portion of the estate of the said testator which is composed of real estate is converted into personal property for the purpose of distribution and the carrying out of the provisions of the said will." The chief contention of the appellants arises upon these conclusions. They insist that the bequest in the tenth clause is void, as against the statute of perpetuities, and in conflict with the decisions of the courts of this state, notwithstanding chapter 701 of the Laws of 1893, which was in force when the will was made, and at the testa-

tor's death, and is entitled "An act to regulate gifts for charitable purposes," and is as follows:

"Section 1. No gift, grant, bequest or devise to religious, educational, charitable, or benevolent uses which shall, in other respects be valid under the laws of this state, shall or be deemed invalid by reason of the indefiniteness or uncertainty of the persons designated as the beneficiaries thereunder in the instrument creating the same. If, in the instrument creating such a gift, grant, bequest or devise there is a trustee named to execute the same, the legal title to the lands or property given, granted, devised or bequeathed for such purposes shall vest in such trustee. If no person be named as trustee then the title to such lands or property shall vest in the supreme court.

"Sec. 2. The supreme court shall have control over gifts, grants, bequests and devises in all cases provided for by section 1 of this act. The attorney-general shall represent the beneficiaries in all such cases and it shall be his duty to enforce such trusts by proper proceedings in the court."

The appellants seem to concede that this statute relieves the bequest from the objection that was so potent before the passage of this remedial act, that the beneficiaries of a trust were so indefinite and uncertain that the trust could not be enforced in their favor; but as the scheme of the testator contemplates a permanent investment of the residuary property, both real and personal, in the charity for the Graves Home for the Aged, the trust is liable to the objection that it suspends the alienation or disposition of property for a longer period than during the continuance and until the termination of two lives in being at the death of the testator. There is no doubt but that the trust is a charitable one, for a purpose highly commendable, and represented the strong desire of the testator as to the disposition of the residuary estate, and to found a home in his own name for a worthy class of aged persons whom misfortune had deprived of their means of support. Perhaps no question has more agitated and confused the courts of this state than this question of charitable uses. The statute of perpetuities was early ingrafted upon our system of law, and the wisdom and necessity of such a statute, aside from its effect upon charitable disposition of property, has not been questioned.

In Williams v. Williams, 8 N. Y. 525, the court of appeals passed upon the validity of two legacies contained in a will which took effect in November, 1841. One legacy gave to the trustees of the Presbyterian Church and Congregation in the village of Huntington and their successors, in trust for the support of a minister of said church, the sum of $6,000, which was to be invested, and the interest accruing thereon to be annually applied for such support. The other legacy constituted three persons of the village of Huntington, and their successors, trustees. Six thousand dollars was given to such trustees as a perpetual fund for the education of the children of the poor at the academy in the village of Huntington. It was objected that these legacies were void as against the statute of perpetuities, and Judge Denio, in an exhaustive opinion, reviewed the history of charities, the statute of 43 Eliz., and the law of charitable uses that had existed in England, and as administered by the court of chancery of that country. The court of appeals held that the law of charitable uses as it existed in England at the time of the Revolution, and the jurisdiction of the court of chancery over the subject, became the law of this state

upon the adoption of the constitution in 1777, and had not been repealed; that such law does not derive its origin from the statute of 43 Eliz., nor depend upon it, but that it was borrowed from the civil law, as modified by the institutions of Christianity, and at a very early period became part of the common law, and that the statute of Elizabeth merely furnished a remedy for the abuse of charities in England, but was not applicable to the circumstances in this country; that, the object of this class of corporations being to perpetuate the uses of the property acquired by them, a donor may prescribe as a condition of his gift that it be preserved in a particular manner, in order to render it subservient to the objects for which he gives it, and the statute against perpetuities does not affect property given in perpetuity to religious or charitable institutions. A brief reference to the statute of 43 Eliz., and to the jurisdiction of the English chancery in regard to charitable uses, may be serviceable here. The preamble of the statute sets forth that property of every kind had been given, limited, appointed, and assigned by the queen, and other well-disposed persons, for some or other of the purposes which it enumerates as follows:

"Relief of aged and impotent poor people; maintenance of sick and maimed soldiers and mariners; schools of learning; free schools; scholars in universities; houses of correction; repairs of bridges, ports, havens, causeways, churches, sea banks, and highways; education and preferment of orphans; marriage of poor maids; supportation and help of tradesmen, handicraftsmen, and persons decayed; relief or redemption of prisoners or captives; and aid or ease of any poor inhabitants concerning payments of fifteens, setting out of soldiers and other taxes."

It then recites that the lands and effects so appropriated had not been duly employed, and for redress and remedy of such abuses and breaches of trust it was enacted that it should be lawful for the lord chancellor or lord keeper of the great seal, and for the chancellor of the duchy of Lancaster, within their respective jurisdictions, to award commissions to the bishops of the diocese and chancellor and to other persons, authorizing them to inquire, as well by the oaths of 12 men, as by other good and lawful ways and means, of all gifts, limitations, assignments, and appointments, and of the abuse, breaches of trust, misemployment, and misgovernment of any property which had been appointed or assigned to or for any of the charitable and godly uses aforesaid. The commissioners had the power to make orders for the proper application of the property given in trust. These orders were to be certified to the court of chancery, and executed by the chancellor, if fit and convenient. This statute was passed in 1601. The English system of enforcing charitable dispositions of property sanctioned a twofold method. One was under the sanction and by the sign manual of the crown, and the other was through the court of chancery. The crown also exercised direct power through the chancellor, the chancellor executing the decree in the king's behalf; not as chancellor, but in the exercise of a ministerial function as the keeper of the king's conscience. The exercise of this power by the crown was called the "prerogative power." If bequests or devises to charity, while commendable and proper in themselves, were in conflict with some law of the realm, or so defective in their nature as to be impracticable of execution,—for example, if a testator

bequeathed a sum of money in trust for such charitable purpose as he shall name thereafter, and dies without naming the purpose, and it was plain that the testator had a charitable intent, but the only power to enforce such a bequest resided in the crown, and in cases where trustees had been appointed to execute the trust, and the general nature of the trust pointed out, but no intention is expressed to limit it to a particular institution or mode of application, and afterwards, either by a change of circumstances or other reasons, it becomes impracticable to carry out the scheme of the testator,—the court of chancery (the fund once having vested in charity) will carry out the charitable intent as near the testator's particular directions as possible. This jurisdiction obtained in other cases of incomplete trust for want of a defined beneficiary, or want of appointment of agencies to carry out the trust; the principle upon which the crown and the court acted being not to permit the trust to fail if it could possibly be saved, and carry out the charity by invoking the prerogative power or the doctrine of cy-pres. The definition of the word "cy-pres" is, "as near to." Imp. Dict. This authority also defines the term as follows:

"When there is an excess in an appointment under a power executed by will affecting real estate, the court will carry the power as near to (cy-pres) the testator's intention as practicable, and prevent such excess disappointing the general design. This doctrine is not applicable to personalty, but is confined to wills. In regard to charitable legacies, where a literal execution becomes inexpedient or impracticable, the court will execute it as nearly as it can according to the original purpose, or, as the technical expression is, 'cy-pres.'"

The doctrine is stated in 5 Am. & Eng. Enc. Law (2d Ed.) p. 936, as follows:

"Where an apparent charitable intention has failed, whether by an incomplete disposition at the outset, or by subsequent inadequacy of the original object, effect will be given to it by a cy-pres or proximate application, notwithstanding that in ordinary cases the trust would be void for uncertainty, or would result to the donor or his representatives,"—citing Adams, Eq. 69.

The prerogative power exercised by the crown was not ingrafted upon our system as a part of our inheritance of English law and chancery jurisdiction. That power only exists in this country in the legislatures of the several states.

"The jurisdiction of the court of chancery in England in relation to charities was derived from three sources: First, from its ordinary jurisdiction over trusts; second, from the prerogative of the crown; third, from the statute of 43 Eliz. c. 4. * * * This statute was embraced in the general repeal of English statutes in 1788, and it is not in force here, and it seems equally clear that our courts are not endowed with any portion of the power which the chancellor of England exercises by virtue of the royal prerogative. * * * It follows that the jurisdiction possessed by the courts of this state over trusts for charitable purposes is limited to that which the court of chancery in England possessed, independent of those two sources." Owens v. Society, 14 N. Y. 387, 388.

Several cases had been decided in this state prior to the case of Williams v. Williams, which seemed to hold a similar doctrine as in the Williams Case, but a case widely different in its facts (Bascom v. Albertson, 34 N. Y. 584) from that of Williams v. Williams, decided

16 years later, assumed directly to overrule the case of Williams v. Williams in several respects, and held that the English system of charitable uses had no existence in this state, and no place in our system of jurisprudence; that the authority prior to the statute of 43 Eliz. was exercised by the English court of chancery in respect to pious and charitable uses, and, as distinguished from other uses and trusts, was not a part of its original and inherent judicial power as an equitable tribunal, but a branch of the jurisdiction it assumed to exercise in virtue of the royal prerogative and the cy-pres powers, with which the courts of this state have not been invested; that the design and effect of the repeal of the statute of Elizabeth and of the mortmain act of 9 Geo. II. c. 36, was to abrogate in this state the English law of indefinite charitable uses, and there is nothing to withdraw gifts to mere private trustees or indefinite charitable uses from the statute against perpetuities. This case was followed by a series of other cases in the court of appeals. Pritchard v. Thompson, 95 N. Y. 76; Holland v. Alcock, 108 N. Y. 312, 16 N. E. 305; Cottman v. Grace, 112 N. Y. 307, 19 N. E. 839; Fosdick v. Town of Hempstead, 125 N. Y. 581, 26 N. E. 801; Tilden v. Green, 130 N. Y. 29, 28 N. E. 880. And see Burrill v. Boardman, 43 N. Y. 254; People v. Powers, 147 N. Y. 104, 41 N. E. 432. But in Bird v. Merklee, 144 N. Y. 549, 39 N. E. 646, the court says, in speaking of Williams v. Williams, supra, and of the bequests therein mentioned:

"It was there held that the provisions of the Revised Statutes against perpetuities do not affect the property given in perpetuity to religious or charitable institutions. While this case has been disapproved as to another bequest involving the existence of the English system of charitable uses in this state, the decision sustaining the bequest referred to has not only never been questioned, but has been expressly approved in subsequent cases in this court,"—citing Wetmore v. Parker, 52 N. Y. 457; Holland v. Alcock, 108 N. Y. 337, 16 N. E. 315.

The rule established in Williams v. Williams, however, as to charitable trusts not being obnoxious to the statute of perpetuities, has received the sanction of the United States supreme court and of the courts of nearly every state in the Union outside of our own, although in those states similar statutes to our own against perpetuities are in force. See 2 Perry, Trusts (2d Ed.) § 748, note 1. "Charitable trusts are not within the rule against perpetuities, nor are they affected by or within the scope of statutory or constitutional provisions against perpetuities." 5 Am. & Eng. Enc. Law (2d Ed.) p. 902, and notes 1, 2; Russell v. Allen, 107 U. S. 163, 2 Sup. Ct. 327; 3 Washb. Real Prop. (5th Ed.) 555, and note.

The review I have made of the decisions of this and other states and of the English system in regard to charitable uses discloses the reasons and necessity for legislation in this state defining the law as to charitable trusts in order that they might be protected in the future, and the charitable intention of donors sustained in behalf of that large class of people in our midst who are in need of all that charity can give them. The legislature of 1893 was confronted with a confused condition of things with relation to the laws of charitable trusts, nearly equal to that which disturbed the serenity of Lord Bacon, who,

in the year before the adoption of the statute of 43 Eliz., in a lecture on
the statute of uses, before the Society of Gray's Inn, exclaimed:

"I have chosen to read upon the statute of uses made 27 Hen. VIII., a law
whereupon the inheritances of this realm are tossed at this day like a ship
upon the sea, in such sort that it is hard to say which bark will sink and
which will get to the haven; that is to say, what assurances will stand good
and what will not. Neither is there any lack or default in the pilot, the
grave and learned judges, but the tides and currents of received errors and
unwarranted and abusive experience have been so strong as they were not
able to keep a right course according to law."

It is a curious fact that in nearly all the cases that have passed upon
charitable trusts in this state since the decision in Williams v. Wil-
liams the trust has been declared invalid, either for the want of a legal
trustee to take the title, or a legal beneficiary to claim the equitable
interests. Mainly, the trust has been declared void for the want of
a legal beneficiary. The cases cited, and many others, might be re-
ferred to, to establish this statement. What a picture do these cases
present of disappointed expectations, of hope deferred, of suffering
and want in those who could have been benefited and relieved by the
noble charities that those cases disclose. The donors of these chari-
table gifts have gone to their graves in the wrong belief that they had
done something for the benefit of their fellow men. This condition
amounts to an "evil and reproach." Fairchild v. Edson, 154 N. Y.
212, 48 N. E. 541. A learned author has well said:

"It is always hoped, where funds are given in trust, the income to be ap-
plied to some church, alms house, hospital, or school, that such institutions
will exist indefinitely, and that the donor's bounty will be a perennial spring
for generations." Perry, Trusts, § 737.

As has been said, the appellants assail the charity instituted by the
testator as void, being in conflict with the statute of perpetuities.
Their argument assumes that the scheme of the testator contemplates
a permanent home for the beneficiaries at Syracuse. It is to extend
beyond two lives in being at the death of the testator, and be a perma-
nent institution. Assuming that such will be the situation, the in-
quiry confronts us whether the trust can be sustained. All parties
to this controversy concede that under the decisions of our highest
courts this trust would have been invalid prior to the passage of the
remedial statute (Laws 1893, c. 701). The appellants contend that
that statute only relieves a part of the difficulty which existed before
its passage, viz. the indefiniteness and uncertainty of the beneficiary,
and that all other objects remain as before, and the trust is still obnox-
ious to the statute against perpetuities; and that the objection that
the trustees are not a corporation which can legally assume the trust,
and that there is no provision in the will for the creation of such a cor-
poration during the two lives in being, is still available. As I under-
stand the decisions, the law had become finally settled in this state
that, in order to avoid the statute of perpetuities, the trustees must
be either a corporation that had power to take the property bequeathed
or devised as trustees, or there was a provision in the will for the
creation of such a corporation within the period of two lives in being,
and that that was accomplished. It seems to me that this argument
of the appellants takes too narrow a view of the act of 1893. That

act goes further than to remedy the difficulty as to beneficiaries. It creates a complete system. It provides not only for the protection of the beneficiaries, though unnamed, and only designated as a class, but it provides for a trustee, in all cases, that is competent to take. If the will specifies the trustees by name, whether individuals or corporations, the act vests the legal title to the property of the trust in such trustees, and indicates a purpose to clothe them with the power to take and hold trust property to carry out the purposes of the testator. This is a new feature in the law of charities. Trustee in equity and the legal title are both united in the trustees named in the will. This, however, does not create a merger of the equitable estate in the legal, which never occurs where the intention is otherwise. 1 Perry, Trusts (2d Ed.) § 347, and note 3. The statute goes further, and provides that, if no trustee is named, the trust shall vest in the supreme court; hence the objection so often raised to defeat the charitable intentions of donors, that the cestui que trust is not definitely ascertained, or the trustee not named, or, if named, is not competent to act, cannot prevail in the case at bar, as the remedial statute has provided for both difficulties, so that we have in this case beneficiaries competent to take and trustees competent to hold under this statute. To make the situation clear beyond controversy, the second section of the act provides that the supreme court shall control the gift, and the attorney general of the state shall enforce the trust by a proper proceeding in court. The supreme court thus assumes one of the highest functions of the English chancery court. It takes control of the rights of the beneficiaries. It becomes the guardian of their welfare, and it supplies a trustee when one is lacking.

There is no force in the argument that the supreme court has no jurisdiction in a case where a trustee has been named by the donor, and that it can only act where no trustee has been appointed. This view is too narrow. It is apparent that the legislature intended to clothe the trustee appointed by the donor with the title. The trustee was given the legal title so as to obviate the objection that the title was in abeyance, and, therefore, the bequest void; and when, in the exigencies of human affairs, the trustee named by the donor had died, or ceased to act, the court then assumed the function of trustee, and in doing so only carried out the equitable rule that, where a valid trust was created, equity would not permit the trust to fail for want of a trustee, but the court would appoint one. 1 Perry, Trusts (2d Ed.) § 38; 5 Am. & Eng. Enc. Law (2d Ed.) p. 920, and notes. It would be doing violence to the legislative intelligence, as well as its intention, to suppose that the legislature did not intend the result that must necessarily flow from the new system it had created. The old objections to charitable trusts, so far as concerned the objects of the trust and the agency to execute it, as well as the law of perpetuities, and the disastrous results which had followed, was before it. It had witnessed the specter of the statute of perpetuities rising up, and overthrowing many cases. The legislature well knew that the permanence of trusts of a charitable nature was an indispensable element in their success. I am of opinion that the statute has placed the trust recognized by it beyond the reach of the law against perpetuities,

and necessarily so. The experience of the people of this state with charitable institutions had created no cause for the alarm which was felt in England in an earlier day against the absorbing of vast estates by religious and other corporations, and thus withdrawing them from commerce and business. These institutions in our state, so far as they have been permitted to exercise their functions, have had a beneficent influence; so it had become the best policy of the state to aid this good work by appropriate legislation. Public policy encourages gifts to charitable institutions. Hollis v. Drew Seminary, 95 N. Y. 166–172; Amherst College v. Ritch, 151 N. Y. 335, 45 N. E. 876.

But the learned counsel for the plaintiffs earnestly insists that the clause in the first section of the act of 1893, which provides that no gift, etc., "which shall in other respects be valid under the laws of this state," shall be deemed invalid, etc., subjects the trust therein authorized to the law against perpetuities. The clause quoted refers to the statement that no grant, bequest, or devise, etc., shall be invalid if otherwise valid by the laws of this state. Certain formalities are necessary to create a valid bequest or devise. Then there are many corporations that under their charters, or by the laws creating them, cannot take as trustees. 2 Rev. St. p. 57, § 3, provides that "no devise to a corporation shall be valid unless such corporation be expressly authorized by its charter or by statute to take by devise." We have also the act of 1860, which stands in the way of giving more than one-half of the property of a testator (leaving a wife, etc.) to certain corporations. Other reasons may be suggested for the existence of that clause. As the purpose of the act of 1893 evidently was to give stability and permanency to charitable trusts, and relieve them from the operation of the law against perpetuities, we cannot assume that the clause in question was intended to defeat that purpose.

The guide of our interpretation of statutes is the intention of the legislature. A thing that is within the intention of the legislature is as much within the statute as though it had been stated in definite terms. In determining the intention of the legislature we must also consult the reasons and necessities of the statute, and the causes that led up to it. Instead of naming trustees to carry out the trust, if the testator had named a corporation as trustee, that by the law of its existence was permitted to act as such trustee, then, concededly, the appointment would have been valid. The legislature has supplied a trustee with the same powers to discharge the duties of the trust as the corporation would have had, and the effect of the statute is to clothe these trustees with all the powers that legal trustees could have had. The title to a statute may always be consulted to determine its purpose and intention, and the title to this remedial statute is broad and comprehensive. It is entitled "An act to regulate gifts for charitable purposes"; not to regulate as to the beneficiaries only, but as to the trustees, and for all the purposes of the trust. "When a public statute is remedial in its nature, it should be construed liberally, with a view to the beneficial ends proposed." Hudler v. Golden, 36 N. Y. 446. The briefs of counsel erroneously state that section 93 of chapter 547 of the Laws of 1896 (which constitutes chap-

ter 46 of the General Laws) applies to the trust in this case. The act, though it received the approval of the governor on May 12, 1896, did not take effect until October 1, 1896 (section 301), which was several months after the death of the testator; but that section (93) is a substantial reproduction of the remedial act of 1893, and is a new provision inserted in the laws of the state as a part of the general laws concerning real property. That chapter also covers the laws of uses and trusts, being article 3; section 93 being the last section of the article. Section 71 provides that uses and trusts concerning real property, "except as authorized or modified by this article, have been abolished." Section 32 of chapter 547 contains the statute of perpetuities. Sections 32 and 71, from October, 1896, must be construed in connection with section 93. Taking these sections altogether, do they not indicate the legislative intention to except charitable trusts from the operation of sections 32 and 71? While section 93 does not apply to the trust in this case, the revision is instructive as to the tendency of the legislature in the direction of protecting charitable trusts in real estate from the statute against perpetuities. The remedial act applies to both real and personal property, and has not been repealed. I find no reported case where a court has construed the remedial act. An allusion is made to it in Dammort v. Osborn, 140 N. Y. 43, 35 N. E. 411, where Judge O'Brien says:

"This statute indicates an intention on the part of the legislature to enforce and uphold charitable bequests not heretofore recognized as valid, and it may be regarded as the first step in the direction of modifying the body of law which this court has built up on the ruins of the system outlined in Williams v. Williams, 8 N. Y. 525. The result which the Second division of this court was constrained to reach in a recent case of public importance (Tilden v. Green, 130 N. Y. 29, 28 N. E. 880) no doubt had some influence in creating the sentiment which is embodied in the law."

In the Tilden Case it seems that the law of charitable trusts had become so complicated that Mr. Samuel J. Tilden, a great lawyer, and prominent citizen of the state, was unable to frame a will to furnish a free library to New York City, and to promote scientific and educational purposes; and it was regarded as extremely unfortunate that the court of appeals could find no way to sanction so laudable a purpose.

The learned counsel for Sidney Breese, administrator, and others, makes the point that the will contains no power of selection or appointment of the persons who are to enjoy the privileges of the Graves Home for the Aged. The will does not give, in express language, this power of selection to the trustees, but the power of making such selection is necessarily implied from the powers granted. The trustees received the residuary estate for the purpose of founding, erecting, and maintaining Graves Home for the Aged, to be located in the city of Syracuse, which was intended as a home for those who, by misfortune, had become incapable of providing for themselves, and those who have slender means of support. The accomplishment of this broad purpose involves the right of the trustees to select the occupants of the home, and the inference from the authority given and the location of the institution at Syracuse would seem to be that the beneficiaries of the trust were to be selected in that city, or in its vi-

cinity; but the trust will not be held invalid on account of this objection, as it relates to the uncertainty of the beneficiaries, which the statute has provided for. See Power v. Cassidy, 79 N. Y. 602.

The view is presented that by the terms of the will the trust is limited to the existence of two lives in being (two ladies named in the will), and therefore the trust does not violate the statute of perpetuities. If that statute applies, this, perhaps, is an answer to the claim of the invalidity of the trust; but I prefer to put my decision upon the broader ground I have indicated, that the trust is valid under the remedial act.

The complaint asks that it be adjudged and determined whether, by the provisions of the will, there is an equitable conversion of the real estate into personalty, and counsel discuss that question in their briefs, and I will consider it, though it is difficult to see how it is important in this case, inasmuch as the statutory limitation as to the suspension of ownership of personal property is the same as in the case of real estate. The will vests the residuary fund in the trustees for the purposes of the trust, and directs the founding of Graves Home for the Aged. The debts and legacies shall first be paid, and the residuum, whether of real or personal property, to be used for the purposes of the trust. They are authorized to convert the real estate into money, and it would seem necessary to do so in executing the trust. The executors are authorized and directed, after they have performed their duty, and paid all the legacies, to convey to the trustees the remainder of the property of every kind, to be applied for the purposes of the trust. I think these provisions of the will converted the real estate into personalty. Phelps v. Pond, 23 N. Y. 69; Lent v. Howard, 89 N. Y. 169, 176, 177; Fraser v. Trustees, etc., 124 N. Y. 479–484, 26 N. E. 1034.

But it is insisted by the appellants that, if the residuary gift is valid, the testator has left more than one-half of his property in trust for charitable corporations or associations, in violation of chapter 360 of the Laws of 1860. This act is as follows:

"Section 1. No person having a husband, wife, child or parent shall by his or her last will and testament devise or bequeath to any benevolent, charitable, literary, scientific, religious or missionary society, association or corporation in trust or otherwise more than one half of his or her estate after the payment of his or her debts, and such devise or bequest shall be valid to the extent of one half and no more."

It seems to be assumed by the learned counsel in this case that more than one-half of the testator's estate under his will would go into the residuary trust fund. The testator left a wife, and the question is whether the will gave the residuary estate to any of the corporations or associations named in the statute. If not, the statute has no application. The gift is to trustees individually, to found a home, etc. The trustees are certainly not corporations, nor are they an association, in the legal sense. The fact that in the consummation of the trust the creation of the home might, by the aid of legislation, become an association or corporation, is not material in the consideration of this question. The gift must be to an existing corporation or association, and not to one that the future may develop. The

American & English Encyclopædia of Law (volume 3 [2d Ed.] p. 162) defines an association to be:

"Confederacy or union for particular purposes, good or ill. This term is used throughout the United States to signify a body of persons united without a charter, but upon the methods and forms used by incorporated bodies for the prosecution of some common enterprise. It also enters into the names bestowed by the legislatures upon many corporations. In this connection it is used without any very uniform discrimination as to its precise meaning, but seems to be, on the whole, preferred for bodies which are not vested with full and perfect corporate rights and powers."

This accords with the common understanding of the meaning of the word "association." This statute is a limitation upon the right of a testator to dispose of his property as he sees fit; and, unless the devise or bequest comes plainly within the limitations, it cannot prevail. In Re Crane's Will, 12 App. Div. 271–276, 42 N. Y. Supp. 904, the bequest of the residuary was to the mayor, aldermen, and commonalty of the city of New York, to be expended in the erection of a drinking fountain in the city. The point was taken that it was in conflict with the provisions of the law we are considering. Barrett, J., speaking for the First department, says:

"But this act only applies to benevolent, charitable, literary, scientific, religious, or missionary societies; in other words, to a particular class of private corporations. It does not apply to the state, nor to the individuals, nor to the public, nor municipal corporations."

And see Amherst College v. Ritch, 151 N. Y. 282, 333, 334, 45 N. E. 876; Harris v. Slaght, 46 Barb. 470.

I have reached the conclusion that the residuary fund, under the provisions of this will, is not controlled or affected by the statute (chapter 360 of the Laws of 1860).

The remaining questions to be considered are those arising upon the several appeals brought to review the allowances of costs to the respective parties in the action. The special term made an extra allowance to the attorneys for the plaintiff of $2,000, in addition to the taxable costs; to the attorney and counsel for the trustees, defendants, the taxable costs and $2,000; to the attorney for the attorney general, his taxable costs and an extra allowance of $1,800; to the attorneys for Syracuse University, their taxable costs and an extra allowance of $500; to the attorney for the Syracuse Home Association and two other corporations, defendants, the taxable costs and an extra allowance of $250; to the attorney of the First Reformed Dutch Church of Syracuse, the taxable costs and disbursements and an extra allowance of $500; to the attorneys for the St. Joseph's Hospital, taxable costs and disbursements and an extra allowance of $250; to the attorneys of the General Synod of the Reformed Church of America, taxable costs and disbursements and $50 extra allowance; to the attorney for the heirs and representatives of the deceased widow, costs and disbursements and $250 extra allowance; and to the same attorney an allowance of $250 as a guardian ad litem for an infant. The record in this case contains this statement:

"Upon the settlement of the findings herein, the court, after hearing the counsel for the respective parties as to the amount they claimed should be

awarded to them for extra allowances, made the extra allowances of costs subsequently inserted in the judgment herein. At the time said extra allowances were made no objection was made by any of the parties to this action."

The special term having exercised its discretion as to these costs in an equitable action, and the allowances of costs having been made with the consent of all the parties, the only question to be considered is whether the court had jurisdiction to make the order for extra allowances, and whether the attorneys had the right to consent to such an order. Independent of the consent of parties at the special term in fixing the allowances, there is no doubt of the power of this court to review the discretion of the special term as to allowances for costs. People v. Railroad Co., 29 N. Y. 418; Gorham v. Innis, 115 N. Y. 87–93, 21 N. E. 722. If the clients that the attorneys represented were fairly entitled to an extra allowance, the attorneys had a right to consent thereto at the special term, and the court will not reverse an order obtained upon such consent, unless it appears that the consent of the attorneys was the result of collusion, and in a fraudulent attempt to obtain excessive allowances of costs from the general fund. There is no evidence in this case of any collusion or misconduct on the part of the attorneys; and it does appear from the record upon this appeal, and from the variety and intricacy of the questions involved in the action, that there was much responsibility and labor upon the principal counsel engaged in the case, and for which adequate compensation should be made.

The most serious question that arises upon these appeals is as to the right of the attorney general to costs; that right being challenged by several parties to the action. The attorney general was admitted as a party defendant in the action by the consent of all the parties to the action, "as representative of certain beneficiaries under the last will and testament of the late Nathan F. Graves, of city of Syracuse, New York. The said attorney general be at liberty to serve an answer to the complaint in this action within twenty days from the taking of this order." The attorney general served an answer sustaining and defending the trust created by the will, and demanded judgment that the trust be executed. He appeared upon the trial and upon the appeal by an attorney in Syracuse (the Honorable Frank Hiscock). The attorney general in England and in the several states of this Union has been charged with the duty of defending the rights of beneficiaries in charitable trusts, and enforcing such trusts as against delinquent trustees, and it has been held that:

"There is one branch of the prerogative power which still exists in the United States. It is the duty of the king, as parens patriæ, to superintend the management of all public charities or trusts; and when property is bequeathed for specified charitable objects, and an abuse occurs, the prerogative of the king finds its appropriate exercise through the attorney general, in bringing the case before the court of chancery for a judicial determination." Attorney General v. Mayor, etc., of Dublin, 1 Bligh (N. S.) 348; Corporation of Ludlow v. Greenhouse, Id. 62; Attorney General v. Middleton, 2 Ves. Sr. 328; Attorney General v. Compton, 1 Younge & C. Ch. 417; 2 Perry, Trusts (2d Ed.) § 732; Jackson v. Phillips, 14 Allen, 579; People v. Cogswell, 113 Cal. 129, 45 Pac. 270.

The relation and duty of the attorney general to this class of cases is recognized and enforced in the remedial act of 1893 (chapter 701), and section 2 of that act, which provides that:

"The attorney general shall represent the beneficiaries in all such cases and it shall be his duty to enforce such trust by proper proceedings in the court."

So that by legislative fiat the duty of the crown in England, as represented by the attorney general, in regard to such trusts, is placed upon the attorney general of this state in cases arising therein. By consent of all the parties he was made a party in this action, and as a party he is entitled, in a proper case, to an extra allowance. Section 3253 of the Code of Civil Procedure provides that in difficult and extraordinary cases, where a defense has been interposed in any action, the court may, in its discretion, award to any party (except in mortgage foreclosures) a sum not exceeding 5 per centum of the sum recovered or claimed, or the value of the subject-matter involved; but the next section provides that the allowances made to "two or more parties on the same side cannot exceed in the aggregate, two thousand dollars." Whether the attorney general, under the statute of 1893, should appear as a party, as in the case at bar, or simply as an attorney representing the beneficiaries of the trust and the people of this state who are interested in the enforcement of the trust, I need not consider here; but for the purposes of this action I may treat him as a proper party, and as such he had the undoubted right to counsel, and to such allowances of costs as any other party would have had under the provisions of the Code.

In People v. Powers, 8 Misc. Rep. 628, 29 N. Y. Supp. 950, it was held that a devise for charitable purposes is for a public use, and that an action to enforce it might be maintained in the name of the people by the attorney general. That view is sustained in a reference by the court in that case to many authorities showing the inherent power of the attorney general to represent the people in such actions. The judgment in that case was affirmed by the general term of the Fifth department (83 Hun, 449, 31 N. Y. Supp. 1131), but the judgment was reversed in the court of appeals (147 N. Y. 104, 41 N. E. 432), but upon other grounds; the court of appeals declining to pass upon the question of the attorney general's power to bring the action. The cases of Attorney General v. Insurance Co., 88 N. Y. 571, and People v. Telegraph Co., 11 Abb. N. C. 304, are not in point. In the first case the attorney general had employed special counsel to represent him in an action where a receiver had been appointed, and to aid in the settlement and adjustment of the affairs of an insolvent insurance corporation, and it was claimed that the special counsel could be paid out of the assets of the corporation for his services. The court held that there was no statute of this state authorizing the employment of such special counsel, to be paid in that manner. In the Metropolitan Telegraph Case, upon the trial of a people's action at a New York circuit, the attorney general was represented by counsel, and it was held that there was no statutory authority to appoint special counsel to act generally for him in actions; that under chapter

357 of the Laws of 1848, the attorney general was only authorized to employ additional counsel in prosecuting or defending suits in which the people were a party or interested at any general or special term or at chambers, when official duties prevent his attending in person; it would not answer for him to have such counsel at a circuit. These were decisions which occurred before the passage of the executive law (chapter 683, Laws 1892). The fifty-second section of that act, as amended by Laws 1895, c. 821, required the attorney general to "prosecute and defend all actions and proceedings in which the state is interested, and have charge and control of all the legal business of the departments and bureaus of the state." And by section 55, as amended in 1895, the attorney general may designate and employ such additional attorneys or counsel as may be necessary to assist in the transaction of the legal business mentioned in section 52, and he should be paid out of the treasury of the state, or out of the costs recovered by the attorney general. It would seem from this that the attorney general has the right to pay Mr. Hiscock out of his costs, and, although the costs are awarded in the name of the attorney, it belongs to the attorney general, as a party to the action.

The other jurisdictional question in the case, and which is urged by the learned counsel for the plaintiffs, is that, as the aggregate amount of the allowance to the attorney general and to the counsel for the trustees exceeds $2,000, it was error to allow it, as they were, in fact, both upon the same side, within the meaning of section 3254 of the Code of Civil Procedure. I cannot assent to this contention. While the attorney general and the attorney for the trustees both sought to sustain the trust, they were in no sense on the same side of the controversy. The attorney general represented the people, in a public capacity, and was in the discharge of a public duty. The counsel for the trustees represented individuals charged with a specific trust, and they were not on the same side of the controversy, within the meaning of section 3254.

The counsel for the trustees insists that, as the plaintiffs were defeated in their action, they should have no extra allowance of costs. The action was to construe a will. The plaintiffs had the right to bring the action. The plaintiffs succeeded to the extent of having a construction of the will. They failed in obtaining a judgment construing the will as void, which was a part of the judgment demanded. I think that the court had the power to award the extra allowance to the plaintiffs, it being an equitable action, and a difficult and extraordinary one.

There is but little in the record to guide me as to the value and extent of the services performed by the several attorneys in the action for which allowances have been made. I find, therefore, no basis upon which I might reduce these allowances, and, were I inclined to do so, I am met with the objection, above stated, that all the parties to the action have, in effect, agreed to these allowances, and upon that agreement the special term has acted.